OPINION
{¶ 1} This matter is again before this court after having been remanded to the Lake County Common Pleas Court. In our previous decision, we concluded that the trial court's previous judgment entry (dated February 17, 2004) did not state whether there was a preponderance of substantial, reliable, and probative evidence supporting the Willowick Board of Zoning Appeals' ("BZA") decision, and, therefore, we remanded this matter for that determination.[1]
 {¶ 2} Following this court's remand, the trial court entered a judgment entry upholding the decision of the Willowick city council to deny him the five variances he requested to construct a single-family residence. Appellant, Erick Miller, appeals that judgment entry denying the five variances requested by him. On review, we affirm the judgment entry of the trial court.
 {¶ 3} The facts and procedural history of this matter have been previously set forth by this court, as follows:
 {¶ 4} "When Miller purchased the property at 172 East 317th Street in Willowick, Ohio in 2001, it was a lot with thirty-foot frontage that had a cottage-like structure on it. It and the other houses in the neighborhood were built many years ago as vacation cottages, which were eventually converted into year-round dwellings. Even before he purchased the property, Miller was aware of its inherent limitations in terms of the small lot size. Miller testified that he had `20 conversations' with the local building official relative to rebuilding the structure to suit his intentions. The building official made him aware of the zoning restrictions, but told Miller that he would `work with' Miller to try to accomplish his goal. Soon after purchasing the property, Miller realized that it was not economically feasible to do any substantial construction on the existing structure. He decided it was cheaper to tear down the structure and start anew, and that is what he did. By the time of the Board of Zoning Appeals ('BZA') hearing on March 13, 2002, Miller had razed the structure on the lot.
 {¶ 5} "As a result of tearing down the structure, Miller could no longer avail himself of the structure as a nonconforming use. R.C.713.15 applies to a nonconforming use that has been discontinued:
 {¶ 6} "The lawful use of any dwelling, building, or structure and of any land or premises, as existing and lawful at the time of enacting a zoning ordinance or amendment to the ordinance, may be continued, although such use does not conform with the provisions of such ordinance or amendment, but if any such nonconforming use is voluntarily discontinued for two years or more, * * * any future use of such land shall be in conformity with sections 713.01 to 713.15 of the Revised Code. The legislative authority of a municipal corporation shall provide in any zoning ordinance for the completion, restoration, reconstruction, extension, or substitution of nonconforming uses upon such reasonable terms as are set forth in the zoning ordinance.'
 {¶ 7} "While the ordinance governing non-conforming uses does not appear in the record, the transcript of the BZA hearing clearly reflects an assumption that Miller could no longer avail himself of the structure as a non-conforming use once he tore it down, and our review will proceed on that assumption.
 {¶ 8} "Once the structure was torn down, either Miller had to conform to the current zoning requirements, which would have required him to purchase an adjoining lot in order to conform to a fifty-foot frontage requirement, or he had to design a new structure to fit onto the existing footprint of the old structure. He took the latter course and designed a new structure for himself, which tried to fit onto the old footprint, but went beyond it, and would require variances from the city in order to get a building permit. Based on his prior conversations with the building inspector, he made application for four separate variances, giving as his reason for his request, `to allow for ample living space within home while maintaining original width on house and keeping within the normal width for adjacent homes.' The variances requested by Miller dealt with side yard, front setback, rear yard, and minimum distance in front of the garage.
 {¶ 9} "At the BZA hearing to consider his requests for variances, the BZA modified his requests to add a fifth variance dealing with minimum lot area requirements.
 {¶ 10} "At the BZA hearing, when Miller was asked whether he had considered that the lot might not be a buildable lot, he answered, `[y]es, absolutely.' He went on to explain that, based upon his conversations with the building official, the city would work him to allow him to build a suitable home. When asked if there were other options for the lot, Miller responded, `[t]here's all kinds of options,' explaining that he could sell the lot to an interested neighbor, or he could try to fit a conforming house onto the lot. Four individuals who own property near the subject lot all testified against the granting of the variances. The BZA also had before it Miller's application for variances as well as his intended plan for new home construction, detailing the specific variances he was requesting. Despite acknowledging that Miller had done a `really nice job' in designing a home to try to fit onto the lot, the BZA recommended denial of Miller's requests for variances and referred the matter to city council for its decision. Six days later, council issued an administrative order denying the variances.
 {¶ 11} "Miller then appealed to the Lake County Common Pleas Court, asserting that the denial of his request for variances was arbitrary, capricious, and unreasonable; and that council's decision was not supported by a preponderance of reliable, probative, and substantive evidence.
 {¶ 12} "The matter was submitted to the trial court on briefs. The trial court considered only those claims relating to the administrative appeal from the denial of the requested variances. Two other claims, seeking a declaratory judgment and alleging an unconstitutional taking of property, were not considered. In its decision, the trial court referenced the standard of review in an administrative appeal, namely, that the decision of the administrative entity must be supported by a preponderance of reliable, probative, and substantive evidence in the record. The `Court's Analysis and Conclusion' were as follows:
 {¶ 13} "'Based on careful review of the transcript of the administrative proceeding as well as review of the parties [sic] briefs, it is the order of this Court that the decision of the Willowick Board of Zoning Appeals denying Plaintiff's request for five (5) zoning variances is hereby affirmed. There is no just cause for delay. IT IS SOORDERED.'"[2]
 {¶ 14} As stated previously, this court remanded this matter following a prior appeal, because the judgment entry of the trial court did not state that the BZA's denial of variances requested by Miller was supported by a preponderance of substantial, reliable, and probative evidence.[3]
 {¶ 15} On June 15, 2006, the trial court entered a judgment entry that recited that the BZA decision was supported by a preponderance of substantial, reliable, and probative evidence. It also adopted and incorporated that court's previous judgment entry dated February 17, 2004.
 {¶ 16} Miller has filed the instant appeal from the June 15, 2006 judgment entry, raising the following single assignment of error:
 {¶ 17} "The trial court erred in affirming appellee's denial of appellant's variance requests since appellee's denial was not supported by a preponderance of substantial, reliable and probative evidence in the record."
 {¶ 18} The city of Willowick has not filed a brief in the instant appeal.
 {¶ 19} Initially, we note that R.C. Chapter 2506, which governs administrative appeals, provides at R.C. 2506.04 that:
 {¶ 20} "The [trial] court may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record. * * *"
 {¶ 21} Thus, the standard of review applied by the trial court is whether there is a preponderance of substantial, reliable, and probative evidence in the record to support the administrative agency's decision.[4] The trial court in this case made clear that it was abiding by this standard of review.
 {¶ 22} In addition, the trial court must give due deference to the agency's resolution of evidentiary conflicts.[5] Nor may the court substitute its judgment for that of the agency.[6] Furthermore, the "court is bound by the nature of administrative proceedings to presume that the decision of the administrative agency is reasonable and valid."[7]
 {¶ 23} In this court, the "standard of review is not as broad. As stated by the Supreme Court of Ohio, `"[ R.C. 2506.04] grants a more limited power to the court of appeals to review the judgment of the common pleas court only on `questions of law,' which does not include the same extensive power to weigh the `preponderance of substantial, reliable and probative evidence,' as is granted to the common pleas court."'"[8] Further, "'within the ambit of "questions of law" for appellate court review would be abuse of discretion by the common pleas court.'"[9] Thus, we consider the trial court's judgment entry pursuant to an abuse of discretion standard. An abuse of discretion is a "perversity of will, passion, prejudice, partiality, or moral delinquency."[10] Under this standard of review, a reviewing court may not merely substitute its judgment for that of the trial court.[11]
 {¶ 24} In this court, Miller asserts that he is entitled to area variances for the variances he has requested. Area variances deal with departures from yard, setback, and height requirements.[12] In order to obtain such area variances, Miller was "required to show that the application of an area zoning requirement to his property is inequitable."[13] Further, "in order to grant an area variance, an applicant must demonstrate what practical difficulties would arise if the variance is not granted."[14]
 {¶ 25} The Duncan case enumerated the non-exclusive factors to be considered in determining whether a property owner seeking a variance has encountered practical difficulties in the use of his property. Such factors include, but are not limited to:
 {¶ 26} "(1) [W]hether the property in question will yield a reasonable return or whether there can be any beneficial use of the property without the variance; (2) whether the variance is substantial; (3) whether the essential character of the neighborhood would be substantially altered or whether adjoining properties would suffer a substantial detriment as a result of the variance; (4) whether the variance would adversely affect the delivery of governmental services(e.g. water, sewer, garbage); (5) whether the property owner purchased the property with knowledge of the zoning restriction; (6) whether the property owner's predicament feasibly can be obviated through some method other than a variance; (7) whether the spirit and intent behind the zoning requirement would be observed and substantial justice done by granting the variance."[15]
 {¶ 27} The first of these Duncan factors touches on the economic feasibility of Miller's proposed plan. The court in the Duncan case would require Miller to show something more than that his plan is more economically feasible than some other alternative plan: "[t]he Duncans offered no evidence to show that these plans were not economically feasible, and in the hearings before the board they indicated only that such plans were less feasible than the construction of the eight-unit dwelling."[16] In fact, Miller himself admitted that there were other alternatives, consisting of selling his lot to a neighbor or acquiring a structure that did conform to the lot dimensions. Miller has not demonstrated by a preponderance of the evidence that his proposed plan is the only feasible plan for the lot.
 {¶ 28} The second Duncan factor is whether the variances requested are substantial. The city of Willowick argues that the sheer numerosity of the requests, five in number, renders the variance requests substantial. We agree. Miller has requested variances in all directions for his proposed residence: he would change the side yard setback, the front setback, the rear yard setback, and the minimum distance in front of his garage. Thus, he would change the house dimensions in all directions, which by any definition is substantial.
 {¶ 29} The next factor to be considered is whether the character of the neighborhood would be changed or whether adjoining properties would suffer a detriment is the variances were granted.
 {¶ 30} The record shows that the homes in the neighborhood were vacation cottages, relatively small in size, that were built many years ago. Some of the property owners have remodeled, and others have acquired adjoining lots in order to build larger structures. Miller's proposed plan would result in a relatively large home on a small lot.
 {¶ 31} Further, there was testimony from the neighbor adjoining Miller that the use of their shared driveway would be affected by his construction. At the BZA hearing, Miller promised that this neighbor's use of her driveway would not be affected, but he could not speak for owners who succeed him. She also objected to the loss of privacy, which would result from Miller's two-story house looking down on her one-story house. Thus, the detriment to other property owners was demonstrated in the record.
 {¶ 32} The next factor goes to whether Miller knew about the lot limitations when he purchased the property. His answer to this question at the BZA hearing was, "[y]es, absolutely." Miller tried to exploit the conversations he had with the local building official to show that he had been misled about what he could do with his new house, that "the criteria [for a buildable lot] was going to be whether or not it was grandfathered before Willowick was a city or not," and that the building official committed to "work with" him in the construction of his house. However, Miller has confused two issues here: the "grandfathering" would only pertain to an existing structure, and once Miller decided to demolish the existing structure for economic reasons, the "grandfathering" was no longer available. Then, after the demolition took place, the building official said that he would "work with" Miller, but this did not obviate the need to request variances for his proposed plan, because the new structure would be governed by existing zoning code requirements as opposed to those that may have applied before the demolition took place.
 {¶ 33} The next factor goes to whether any governmental services, for example water, sewer, or garbage, would be affected by the variances being granted. In this regard, because Miller's new house would be so close to the adjoining home, there was concern by the BZA board members as well as neighbors about the increased risk of fire hazard and the difficulty of delivering emergency services where the homes are so close together. The possibility of the next door neighbor losing half her driveway and, thereby, making access by emergency vehicles more difficult was also raised at the hearing.
 {¶ 34} Miller makes the point here that no qualified individual testified at the BZA hearing that the granting of the variance requests would cause a fire hazard. He argues that members of the general public at an adjudication hearing who merely offer their subjective and speculative comments cannot satisfy the burden to adduce reliable, probative, and substantial evidence required to support the BZA decision, citing previous decisions of this court.[17] In this respect, Miller is correct, and "something more than speculation or opinion is required."[18] However, this factor regarding the delivery of governmental services is only one of the Duncan factors to be considered, and no single factor will control whether a variance request should be granted.[19]
 {¶ 35} The next factor considers whether Miller's predicament feasibly can be obviated by means other than a variance. The city of Willowick points out that Miller himself created a need for a variance by demolishing the original structure on his property. Even after demolition, Miller admitted that he could have designed a structure that would conform with existing zoning code requirements when he said, "if you can come back with this is what we can do, then I'll go back to the drawing board and see what I can come up with." Therefore, by Miller's own admission, his difficulties with the lot dimensions can be obviated by means other than his variance requests.
 {¶ 36} The last factor enumerated by the Duncan case considers whether the spirit and intent behind the zoning requirements would be observed and whether substantial justice would be done by granting the variance.
 {¶ 37} Sitting as a reviewing court, we hesitate to second-guess the long-range planning goals and the zoning regulations of a community:
 {¶ 38} "'Common sense requires that the Court take cognizance of a few factors: zoning regulations are about long-range planning, and cannot be upset merely because of short-term, or individualized, inconvenience; zoning regulations are proposed, debated, and enacted by residents of the community directly affected, and a court sitting at a distance should not second-guess the legislative wisdom of the drafters merely because not all parties are happy with the result.'"[20]
 {¶ 39} Miller relies on a previous decision of this court to argue that, in a similar fact situation, this court found that a variance should be granted to construct a single family residence.[21] The facts in the Sullivan case, however, differ markedly from the instant case. First of all, the applicant for a variance in theSullivan case was applying for a variance for an undeveloped lot, unlike Miller's lot, which already had a structure on it.[22] Except for a frontage requirement, there was no other impediment to the construction of a single-family residence. Secondly, unlike Miller in this case, the applicant clearly demonstrated that without the variance she would have no beneficial use for the property and would have to leave the lot vacant.[23] Miller has made no such showing in this case. In Miller's case, he could merely "go back to the drawing board," as he stated, and produce a plan that would conform to the Willowick requirements. The applicant in Sullivan was not so fortunate.
 {¶ 40} While the character of the testimony and the evidence at the BZA hearing might not have been as airtight and as fact-based as we would have liked, the record as a whole demonstrates that, apart from the neighbors' testimony, Miller himself failed to satisfy the first prong of the Duncan case, to show that the denial of his variance requests was inequitable. With respect to the non-exclusive facts enunciated in Duncan, his own responses to the BZA's questions showed that with a little more effort, he could come up with a plan that could satisfy the city's requirements. The plan he offered was only one of other alternatives. The BZA was within its rights to deny Miller's requests for variances.
 {¶ 41} In sum, this court's review on "questions of law," and pursuant to an abuse of discretion standard, concludes that the trial court properly found that there was a preponderance of substantive, reliable, and probative evidence to support the BZA's decision, later finalized by city council, to deny Miller's requested variances. No abuse of discretion was committed by the trial court. For these reasons, we affirm the decision of the Lake County Common Pleas Court.
CYNTHIA WESTCOTT RICE, J., concurs,
COLLEEN MARY OTOOLE, J., concurs in judgment only.
[1] Miller v. Willowick, 11th Dist. No. 2004-L-052,2006-Ohio-132.
[2] Id. at ¶ 2-11.
[3] Id. at 18.
[4] Kisil v. Sandusky (1984), 12 Ohio St.3d 30, 34; Dudukovich v.Housing Authority (1979), 58 Ohio St.2d 202, 207; Meadow Creek Co. v.Brimfield Twp. (June 30, 1994), 11th Dist. No. 93-P-0070, 1994 Ohio App. LEXIS 2944, at *3.
[5] Univ. of Cincinnati v. Conrad (1980), 63 Ohio St.2d 108, 111.
[6] Dudukovich v. Housing Authority, 58 Ohio St.2d at 207.
[7] Community Concerned Citizens, Inc. v. Union Twp. Bd. of ZoningAppeals (1993), 66 Ohio St.3d 452, 456, citing C. Miller Chevrolet, Inc.v. Willoughby Hills (1974), 38 Ohio St.2d 298.
[8] Eye-Will Dev., Inc. v. Lake Cty. Planning Comm., 11th Dist. No. 2004-L-196, 2006-Ohio-6103, at ¶ 16, quoting Henley v. Youngstown Bd. ofZoning Appeals (2000), 90 Ohio St.3d 142, 147, quoting Kisil v.Sandusky, 12 Ohio St.3d at 34, at fn. 4.
[9] Henley v. Youngstown Bd. of Zoning Appeals, supra, at 148, quotingKisil v. Sandusky, supra, at fn. 4.
[10] Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
[11] Id.
[12] Dsuban v. Union Twp. Bd. of Zoning Appeals (2000),140 Ohio App.3d 602, 606.
[13] Duncan v. Middlefield (1986), 23 Ohio St.3d 83, 86.
[14] Rossow v. Ravenna (Mar. 29, 2002), 11th Dist. No. 2001-P-0036, 2002 Ohio App. LEXIS 1498, at *3-4, citing Kisil v. Sandusky,12 Ohio St.3d at 32-33.
[15] Duncan v. Middlefield, 23 Ohio St.3d at 86.
[16] (Emphasis in original.) Duncan v. Middlefield,23 Ohio St.3d at 87.
[17] Adelman Real Estate Co. v. Gabanic (1996), 109 Ohio App.3d 689,694, and Sullivan v. Eastlake Bd. of Zoning Appeals (Dec. 13, 1996), 11th Dist. Nos. 95-L-107 and 95-L-169, 1996 Ohio App. LEXIS 5639, at *15-16.
[18] Adelman Real Estate Co. v. Gabanic, 109 Ohio App.3d at 695.
[19] Duncan v. Middlefield, 23 Ohio St.3d at 86.
[20] Trent v. German Twp. Bd. of Zoning Appeals (2001),144 Ohio App.3d 7, 18.
[21] Sullivan v. Eastlake Bd. of Zoning Appeals, supra, at *17.
[22] Id. at *2-3.
[23] Id.